JUDGE CARTER

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| LOUISIANA MUNICIPAL POLICE EMPLOYEES RETIREMENT SYSTEM, Individually on Behalf of Itself and All Others Similarly Situated,<br><br>Plaintiff,<br><br>v.<br><br>ALTERRA CAPITAL HOLDINGS LIMITED, W. MARSTON BECKER, MICHAEL O'REILLY, JAMES D. CAREY, MERYL D. HARTZBAND, WILLIS T. KING, JR., JAMES L. ZECH, MARIO P. TORSIELLO, K. BRUCE CONNELL, JAMES H. MACNAUGHTON, W. THOMAS FORRESTER, STEPHAN F. NEWHOUSE, ANDREW H. RUSH, MARKEL CORPORATION, and COMMONWEALTH MERGER SUBSIDIARY LIMITED,<br><br>Defendants. | Case No.<br><br>CLASS ACTION<br><br>COMPLAINT FOR SELF-DEALING AND BREACH OF FIDUCIARY DUTY<br><br><br><br><br><br><br><br>13 CV 0933<br><br><br><br>RECEIVED<br>FEB 08 2013<br>U.S.D.C. S.D.N.Y.<br>CASHIERS<br><br>DEMAND FOR JURY TRIAL |

## SUMMARY OF THE ACTION

1.      This is a stockholder class action brought by plaintiff Louisiana Municipal Police Employees Retirement System ("LMPERS") on behalf of holders of common stock of Alterra Capital Holdings Limited ("Alterra" or the "Company") against Alterra, the members of Alterra's Board of Directors (the "Board"), Markel Corporation ("Markel"), and Commonwealth Merger Subsidiary Limited ("Commonwealth"). This action arises out of defendants' pursuit of a sale of the Bermuda-incorporated company to Markel at an unfair price through an unfair and self-serving process, which "oppressive" conduct against Alterra's shareholders violates section 111 of the Bermuda Companies Act of 1981. In addition, as part of its effort to seek shareholder approval, the Board filed with the U.S. Securities and Exchange Commission ("SEC"), and disseminated to Alterra shareholders, a false and materially misleading Schedule 14A Definitive Proxy Statement (the "Proxy"), which violates sections 14(a) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and SEC Rule 14a-9 promulgated thereunder.

2.      On December 19, 2012, Alterra and Markel announced a definitive agreement pursuant to which each Alterra shareholder will receive consideration consisting of 0.04315 shares of Markel common stock and a cash payment of $10 per Alterra share (the "Proposed Merger"). Based on the closing price of Markel stock on December 18, 2012 (the last trading day before the deal was announced), the Proposed Merger represents an equity value of $3.13 billion or approximately $30.97 per share. Following the closing of the Proposed Merger, Alterra shareholders will own an approximately 31% equity interest in Markel. The shareholder vote on the Proposed Merger is set for February 26, 2013.

3.      Alterra is an insurance company that provides specialty insurance and reinsurance products to corporations, public entities, and property and casualty insurers. Historically, Alterra

(including its predecessor company Max Capital Group Ltd.) has enjoyed strong profits and consistent growth in book value. However, in 2011, the insurance industry was plagued by a record number of catastrophic losses that weighed on Alterra's net income for that year. Still, because of its demonstrated record of underwriting expertise and discipline in specialty insurance areas, Alterra survived these catastrophic losses better than its competitors and returned to its former levels of profitability and growth in 2012.

4.      Despite its bright prospects as a standalone company, when approached by Markel in mid-2012, the Board jumped at the first opportunity to sell the Company to one of its peers in the insurance industry. From the outset, the Board immediately locked in on a sale of the Company to Markel and never considered, much less explored, other strategic opportunities, such as remaining a standalone company or a sale to another bidder. In fact, the Board did not take any steps to gauge third-party interest; it neither conducted a market check nor even approached a single party other than Markel about a potential transaction before agreeing to the merger. The failure to conduct even a pro forma pre-signing market check is even more egregious in light of the Board's agreement to a no-solicitation provision in the Agreement and Plan of Merger dated December 18, 2012 ("Merger Agreement"), that has precluded them from contacting any parties post-signing.

5.      In order to ensure that the Proposed Merger is promptly completed, the Individual Defendants (as defined herein) agreed to a number of preclusive and draconian deal protection devices. In particular, defendants agreed to: (i) a termination fee of $94.5 million if the Company terminates the deal to accept a superior proposal; (ii) a three-day matching rights in the unlikely event a higher bid is made; and (iii) a no-solicitation clause that will preclude any topping bids from emerging. In a further effort to lock up the deal by limiting the number of shares needed to gain shareholder approval, defendants: (i)   approved an amendment to Alterra's By-Laws that, if

approved by the shareholders, would modify the shareholder approval threshold needed to complete the transaction from a supermajority (75%) to a simple majority (50% +1); and (ii) along with two major shareholders, entered into voting agreements in conjunction with the merger agreement that committed nearly 20% of the voting shares to vote in favor of the Proposed Merger.

6.       On January 18, 2013, defendants filed with the SEC, and disseminated to Alterra shareholders, the materially false and misleading Proxy. The Proxy, which recommends that Alterra shareholders vote in favor of the Proposed Merger, omits and/or misrepresents material information in contravention of sections 14(a) and 20(a) of the Exchange Act regarding: (i) the unfair sales process for the Company; (ii) the financial analyses of its financial advisor Bank of America Merrill Lynch ("BAML"), and (iii) the financial projections prepared by Alterra management and used in BAML's analyses. Of these omissions, the most significant is the Proxy's complete failure to include any of the financial forecasts prepared by Alterra's management, which makes the description in the Proxy of BAML's financial analyses and resulting opinion that the deal is financially fair materially misleading.

7.       As explained herein, the above omitted information is material to the impending decision of Alterra shareholders whether or not to vote in favor of the Proposed Merger. As such, defendants' violations of sections 14(a) and 20(a) of the Exchange Act threaten shareholders with irreparable harm for which money damages are not an adequate remedy. Thus, plaintiff seeks injunctive relief to ensure that defendants cure their violations of law before Alterra shareholders are asked to vote on the Proposed Merger.

8.       To remedy the Individual Defendants' misconduct, plaintiff seeks, inter alia: (i) injunctive relief preventing consummation of the Proposed Merger, unless and until the Company adopts and implements a procedure or process to obtain a transaction that provides the best possible

terms for shareholders, and defendants disclose all material information concerning the Proposed Merger to Alterra shareholders; (ii) a directive to the Individual Defendants to obtain a transaction which is in the best interests of Alterra shareholders; and (iii) rescission of, to the extent already implemented, the Merger Agreement or any of the terms thereof.

## JURISDICTION AND VENUE

9.      This Court has jurisdiction in this case arising under Article III of the United States Constitution and 28 U.S.C. §1331 because of claims arising under sections 14(a) and 20(a) of the Exchange Act.  This Court also has supplemental jurisdiction pursuant to 28 U.S.C. §1367(a) over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution.

10.     This Court has jurisdiction over each defendant named herein because each defendant is either a corporation that conducts business in and maintains operations in this District, or is an individual who has sufficient minimum contacts with this District to render the exercise of jurisdiction by the District courts permissible under traditional notions of fair play and substantial justice.

11.     Venue is proper in this Court in accordance with 28 U.S.C. §1391(a) because: (i) Alterra maintains its principal place of business in this District; (ii) one or more of the defendants either resides in or maintains executive offices in this District; (iii) a substantial portion of the transactions and wrongs complained of herein, including the defendants' primary participation in the wrongful acts detailed herein, and aiding and abetting and conspiracy in violation of fiduciary duties owed to Alterra, occurred in this District; and (iv) defendants have received substantial compensation in this District by doing business here and engaging in numerous activities that had an effect in this District.

## PARTIES

12.    Plaintiff LMPERS is, and has been at all relevant times, a shareholder of Alterra.

13.    Defendant Alterra is a Bermuda corporation that provides various specialty insurance and reinsurance products and services to corporations, public entities and insurance companies. Upon completion of the Proposed Merger, Alterra will be a wholly owned subsidiary of Markel. The principal executive offices of Alterra are located at Alterra House, 2 Front Street, Hamilton, HM 11, Bermuda.

14.    Defendant W. Marston Becker ("Becker") is Alterra's President and Chief Executive Officer ("CEO") and has been since October 2006 and a director and has been since April 2004. Defendant Becker also holds various other positions with several of Alterra's subsidiaries.

15.    Defendant Michael O'Reilly ("O'Reilly") is Alterra's Chairman of the Board and a director and has been since May 2010. Defendant O'Reilly was also Harbor Point Limited's ("Harbor Point") Chairman of the Board from March 2010 to May 2010, Deputy Chairman of the Board from December 2005 to March 2010, and a director from December to 2005 to May 2010.

16.    Defendant James D. Carey ("Carey") is Alterra's Deputy Chairman of the Board and has been since at least February 2013 and a director and has been since May 2010. Defendant Carey was also a Harbor Point director from March 2010 to May 2010. Defendant Carey is a senior principal of Stone Point Capital LLC ("Stone Point"), the manager of Trident III Professionals Fund, L.P. and Trident III, L.P. ("the Trident Funds"). In connection with the Proposed Merger, Stone Point and the Trident Funds entered into a voting agreement with defendant Alterra, pursuant to which they agreed to vote their shares, representing approximately 13.4% of Alterra common stock, in favor of the Proposed Merger and against any alternative proposal.

17.    Defendant Meryl D. Hartzband ("Hartzband") is an Alterra director and has been

since May 2010.  Defendant Hartzband is also Chief Investment Officer of Stone Point, and a member of the investment committees of the general partners of the Trident Funds.  In connection with the Proposed Merger, Stone Point and the Trident Funds, both of which are major investors of Alterra, entered into a voting agreement with defendant Alterra, pursuant to which they agreed to vote their shares, representing approximately 13.4% of Alterra common stock, in favor of the Proposed Merger and against any alternative proposal.

18.    Defendant Willis T. King, Jr. ("King") is an Alterra director and has been since September 1999.  Defendant King was also an Alterra Bermuda Limited ("Alterra Bermuda") director from September 1999 to May 2007.

19.    Defendant James L. Zech ("Zech") is an Alterra director and has been since December 1999.  Defendant Zech was also an Alterra Bermuda director from December 1999 to May 2007.

20.    Defendant Mario P. Torsiello ("Torsiello") is an Alterra director and has been since March 2000.  Defendant Torsiello was also an Alterra Bermuda director from March 2000 to May 2007.

21.    Defendant K. Bruce Connell ("Connell") is an Alterra director and has been since February 2007.  Defendant Connell also serves as a director of certain other subsidiaries of Alterra.

22.    Defendant James H. MacNaughton ("MacNaughton") is an Alterra director and has been since May 2008.  Defendant MacNaughton also serves as a director of certain other subsidiaries of Alterra.

23.    Defendant W. Thomas Forrester ("Forrester") is an Alterra director and has been since May 2010.  Defendant Forrester was also a Harbor Point director from January 2007 to May 2010.

24.     Defendant Stephan F. Newhouse ("Newhouse") is an Alterra director and has been since May 2010.  Defendant Newhouse was also a Harbor Point director from December 2005 to March 2010.

25.     Defendant Andrew H. Rush ("Rush") is an Alterra director and has been since May 2010.  Defendant Rush was also a Harbor Point director December 2005 to May 2010.

26.     Defendant Markel is a Virginia corporation with principal executive offices located at 4521 Highwoods Parkway, Glen Allen, Virginia.  Defendant Markel is a diverse financial holding company serving a variety of niche markets.  Defendant Markel's principal business markets and underwrites specialty insurance products, competing in three segments of the specialty insurance marketplace: the Excess and Surplus Lines, the Specialty Admitted, and the London markets.

27.     Defendant Merger Sub is a Bermuda exempted company and a wholly owned subsidiary of defendant Markel.  Upon completion of the Proposed Merger, defendant Merger Sub will merge with and into Alterra and cease its separate corporate existence.

28.     The defendants named above in ¶¶14-25 are sometimes collectively referred to herein as the "Individual Defendants."

## BACKGROUND TO THE MERGER

29.     According to the Company's website, Alterra is "a global enterprise dedicated to providing diversified specialty insurance and reinsurance products to corporations, public entities, and property and casualty insurers."  The Company operates in five segments:  Insurance, Reinsurance, U.S. Specialty, Alterra at Lloyd's, and Life and Annuity Reinsurance and has operations in the United States, Europe, and Latin America. The Company was formed on May 12, 2010, as the product of a merger between Alterra, a direct wholly owned subsidiary of Max Capital Group Ltd., and Harbor Point.  After recording strong profits and revenue levels in 2010, the

Company stumbled slightly in 2011 due to a record number of catastrophic losses hitting the insurance industry. Still, Alterra survived this down year for the industry in better shape than most of its peers, as it managed to record positive earnings and book value growth. The Company rebounded in the first half of 2012 and was on pace to achieve strong earnings and book value growth when it decided to pursue a merger with Markel.

30.     When Markel contacted Alterra in mid-2012 about a business combination, the Board leaped at the opportunity to sell the Company to its industry competitor. Specifically, at an August 8, 2012 meeting, the Board decided, without even discussing other potential acquirers or other strategic alternatives, to launch the Company into exclusive merger negotiations with Markel. Notably, at no time during the merger process did the Board consider any other potential merger candidates or other potential strategic alternatives. In fact, the Board did nothing to apprise itself of third party interest prior to entering into the merger with Markel. Further reflecting the rushed and nondeliberative process, the Board also decided at the August 8, 2012 meeting, without considering any other candidates, to retain BAML as its financial advisor in connection with its merger discussions with Markel. That same day, Alterra and Markel entered into a confidentiality agreement and commenced negotiations and due diligence efforts immediately thereafter.

31.     Between late August and mid-December 2012, the parties negotiated the terms of merger with defendant Becker negotiating nearly exclusively on Alterra's behalf. During this time period, the parties exchanged numerous offers and counteroffers regarding the proposed sale of the Company – including term sheets submitted on August 28, September 6, November 7 and 13, and December 12, 2012, the proposals made by Steven A. Markel ("S. Markel") in his October 24, 2012 and December 10, 2012 conversations with defendant Becker, and defendant Becker's December 11, 2012 e-mail proposal – but the Proxy is completely silent on the terms of any of these proposals.

While the Proxy states that these offers included, among others, key terms such as the purchase price, the timing of the transaction, and the post-merger board representation, it fails to disclose to Alterra shareholders any of the actual terms.

32.     As the parties were nearing completion of the deal, defendant Becker sent an e-mail on December 11, 2012 to Markel, Vice Chairman of Markel, in which, according to the Proxy, he "identified potential synergies and costs savings and included proposed valuation terms." The Proxy does not disclose what these potential synergies, cost savings, and proposed valuation terms were. Between December 12 and 18, 2012, the parties finalized the terms of the Merger Agreement but the Proxy is again silent on these negotiations of the terms of the Proposed Merger.

33.     On December 18, 2012, the Board approved the Merger Agreement with Markel and an amendment to the Company's By-Laws that, subject to shareholder approval, lower the percentage of Alterra shareholders needed to approve the Proposed Merger from a supermajority (75%) to a simple majority.

## THE PROPOSED MERGER

34.     On December 19, 2012, Alterra and Markel jointly issued the following press release announcing that the Individual Defendants had agreed to sell Alterra to Markel for a combination of cash and shares valued, as of December 18, 2012 (based on the closing price of Markel's stock), at $30.97 per Alterra share:

> RICHMOND, Va. & HAMILTON, Bermuda--(BUSINESS WIRE)--Dec. 19, 2012-- Markel Corporation ("Markel") (NYSE: MKL) and Alterra Capital Holdings Limited ("Alterra") (NASDAQ: ALTE; BSX: ALTE.BH) announced today that their respective boards of directors have each unanimously approved a definitive merger agreement. Under the terms of the agreement, the aggregate consideration for Alterra is approximately $3.13 billion, based on a closing price of $486.05 for Markel common stock on December 18, 2012.
>
> At closing, each Alterra common share will be converted into the right to receive 0.04315 Markel common shares (with cash paid for fractional shares) plus a cash payment of $10. Following the merger, Markel's existing shareholders will own

approximately 69% of the combined company on a fully diluted basis, with Alterra's shareholders owning approximately 31%. Completion of the transaction is contingent upon customary closing conditions, including shareholder and regulatory approvals, and it is expected to close in the first half of 2013.

Upon closing, two directors designated by Alterra's current board will be added to the board of directors of Markel.

Steven A. Markel, Vice Chairman of Markel, commented: "We are very pleased to have reached this agreement to acquire Alterra, an impressive company with proven worldwide underwriting operations in product lines that we believe are highly complementary to Markel's existing lines. In particular, the addition of Alterra's reinsurance and large account insurance portfolios will serve to diversify and strengthen Markel's current book of specialty insurance business. We look forward to welcoming Alterra's talented underwriting teams to Markel – with their help and the benefit of approximately $6 billion in combined shareholders' equity, we believe we will be well positioned to take advantage of a wide range of profitable opportunities."

W. Marston (Marty) Becker, President and Chief Executive Officer of Alterra, who is expected to leave the company following the close of the transaction, said: "The combination of Alterra with Markel will create an incredibly strong company in global specialty insurance and investments. The demonstrated track record of underwriting discipline in niche market segments by both companies, along with Markel's proven asset management strengths, should benefit all stakeholders. I am confident that Alterra's shareholders, clients and other business partners will continue to be well served when Alterra's underwriting operations join forces with Markel's, and all should benefit from the superior financial strength, expanded capabilities and synergies created by the combined entity."

**Strategic and financial attributes associated with the combination of Markel and Alterra:**

The combination of Markel and Alterra is expected to create significant benefits for the shareholders of both companies, and to provide a robust foundation for strong financial performance going forward.

Enhanced size and scale: Following the close of the transaction, Markel is expected to write annual gross premiums of approximately $4.4 billion and to have approximately $6 billion in equity with capital flexibility to support future growth.

Strong and well diversified franchise: Complementary business profiles provide important diversification of risk, with Markel adding reinsurance and large-account insurance to its specialty insurance portfolio. Following the close of the transaction, Markel's business is expected to be approximately 50% short-tail, 50% long tail; 67% insurance and 33% reinsurance.

Common cultures of underwriting discipline: The merger brings together seasoned and accomplished underwriting teams with limited overlap in diverse specialty insurance and reinsurance lines.

Strong investment performance: Markel brings a long and successful track record of investment outperformance. This expertise can now be applied to the combined entity's investment portfolio of over $16 billion.

\*\*\*

Citigroup acted as financial advisor to Markel and Debevoise & Plimpton LLC and Appleby's as legal counsel. BofA Merrill Lynch acted as financial advisor to Alterra and Akin Gump Strauss Hauer & Feld LLP and Conyers Dill & Pearman as legal counsel.

35.     That same day, Alterra's officers and directors, along with two of Alterra's major investors, who collectively own nearly 20% of the voting power of Alterra, entered into voting agreements whereby they committed to voting in favor of the Proposed Merger.  Thus, if the proposed By-Law amendment is approved by shareholders, Alterra only requires an additional 31% of Alterra public shareholders to vote in favor of the deal in order to gain approval.

## THE PRECLUSIVE DEAL PROTECTION DEVICES

36.     Also on December 19, 2012, Alterra filed a Form 8-K with the SEC wherein it disclosed the Merger Agreement. The announcement and filing reveal that the Proposed Merger is the product of a flawed sale process and, unless the offering price is increased, would be consummated at an unfair price.  The Merger Agreement also reveals that the Individual Defendants agreed to a number of oppressive deal protection devices designed to preclude any competing offers for Alterra.

37.     Specifically, section 5.4 of the Merger Agreement subjects the Company to a strict no-solicitation clause that prohibits the Company from seeking a superior offer for its shareholders. Though this section provides a purported "fiduciary out" provision, this benefit is of negligible, if any, value because it permits the Company to negotiate with another bidder only if that party,

without the benefit of non-public information, first makes an unsolicited acquisition proposal that the Board concludes is "superior."

38.     Furthermore, under section 5.4(d) of the Merger Agreement, should the Board determine that any such third party proposal is, in fact, "superior" and decide to change its recommendation regarding the Proposed Merger, Markel is granted a three-day period to negotiate a counter offer that need only be as favorable (but not more so) to the Company's shareholders as the acquisition proposal.  Given Markel's right to match any competing bid, a rival bidder is even less likely to emerge.

39.     The likelihood of another offer emerging is further reduced by the size of the termination fee.  Pursuant to section 7.2(b) of the Merger Agreement, the Company is obligated to pay a termination fee of $94.5 million (which equates to an approximately 3.2% of the equity value of the Proposed Merger) if it accepts a superior bid.

40.     Sensing that it may lack sufficient shareholder support for the Proposed Merger, the Board has taken additional steps to attempt to lock in the transaction by limiting the number of voting shares necessary to gain shareholder approval.  First, the Board has agreed to amend the Company's By-Laws to modify the percentage of voting shares necessary to approve the Proposed Merger from a supermajority (75%) to a mere simple majority (50% +1).  Second, the Board secured voting agreements from shareholders who collectively own approximately 20% of the voting shares of the Company.  The upshot of the Board's maneuvers is that, should the shareholders approve the proposed By-Law amendment at the February 26, 2013 shareholder meeting, the Company will need only another 31% of the common shares to vote in favor of the Proposed Merger in order to gain the requisite shareholder approval.

## FAILURE TO MAXIMIZE VALUE

41.     In order to meet their duties, the Individual Defendants are obligated to explore transactions that will maximize shareholder value, and not structure a preferential deal for themselves. Due to the Individual Defendants' eagerness to enter into a transaction with Markel, they failed to implement a process to obtain the maximum price for Alterra shareholders.

42.     As a result of defendants' conduct, Alterra's public stockholders have been and will continue to be denied the fair process and arm's-length negotiated terms to which they are entitled in a sale of their Company. The consideration reflected in the Merger Agreement does not reflect the true inherent value of the Company at the time the Proposed Merger was announced.

43.     The consideration offered in the Proposed Merger is inadequate, as it represents a mere 33.8% premium to the price at which Alterra stock was trading prior to the announcement of the Proposed Merger. The deal price is especially inadequate given the strategic benefits Markel will receive from the transaction. First, Markel will realize substantial undisclosed cost synergies and economies of scale from incorporating Alterra's Specialty and London insurance (i.e., Alterra at Lloyd's) divisions into its existing business lines following the merger. Second, the Proposed Merger will enable Markel to diversify its specialty insurance business by adding Alterra's global insurance and global reinsurance operations. Following the announcement of the merger, Markel held an investor's conference call in which S. Markel stated that "the addition of Alterra's reinsurance and large account insurance portfolios will serve to diversify and strengthen Markel's current book of specialty insurance business." As a result of these and other benefits, the Proposed Merger will be accretive to Markel's key performance metrics, including book value per share, premiums per share, and invested assets per share.

## UNFAIR DEALING

44.    Because the Individual Defendants dominate and control the business and corporate affairs of Alterra and have access to material, non-public information concerning Alterra's financial condition and business prospects, there exists an imbalance and disparity of knowledge and economic power between them and the public shareholders of Alterra. Therefore, it is inherently unfair for the Individual Defendants to execute and pursue any merger or acquisition under which they will reap disproportionate benefits to the exclusion of obtaining the best shareholder value reasonably available. Nonetheless, the Proposed Merger represents an effort by the Individual Defendants to aggrandize their own financial position and interests at the expense of and to the detriment of the Class (as defined herein) by denying the Class members their shareholder rights by selling Alterra via an unfair process and at an inadequate price. Accordingly, the Proposed Merger will benefit the Individual Defendants at the expense of Alterra shareholders.

45.    Instead of attempting to negotiate an agreement reflecting the best consideration reasonably available for Alterra shareholders who they are duty-bound to serve, the Individual Defendants disloyally placed their own interests first, and tailored the terms and conditions of the Proposed Merger to meet their own personal needs and objectives by agreeing to sell the Company to a buyer that would retain members of the Company's Board going forward. Specifically, the Board secured two seats on the board of the post-closing company, which are expected to be filled by defendants O'Reilly and Connell.

46.    In addition, certain of the Individual Defendants will also receive accelerated stock option benefits and other compensation in connection with the Proposed Merger. For example, defendant Becker could receive total compensation in the amount of approximately $24.6 million,

including an approximately $2.8 million payment for the acceleration of his unvested restricted and performance shares, following the merger.

## THE MATERIALLY MISLEADING PROXY

47.      In order to secure shareholder approval of this unfair deal, defendants on January 18, 2013 filed with the SEC, and disseminated to Alterra shareholders, the Proxy which set February 26, 2013 as the date of the shareholder vote on the Proposed Merger.  The Proxy misrepresents and/or omits material information necessary for Alterra's public shareholders to make an informed decision regarding whether to vote in favor of the Proposed Merger or seek appraisal of their shares. Specifically, as set forth below, defendants fail to provide the Company's shareholders with material information and/or provide them with materially misleading information concerning: (i) the process leading to the sale of the Company; (ii) the financial analyses performed by BAML, the Company's financial advisor; and (iii) the Company's financial projections.

**Inadequate Disclosure Concerning the Sales Process**

48.      With respect to the limited process that led to the Proposed Merger, the Proxy is materially deficient because it fails to disclose the key terms, including, but not limited to, the form and value of consideration, Board representation of the post-closing company, the timing of the transaction, and the deal protection provisions, for each of the parties' offers and counteroffers regarding the sale of the Company, including, but not limited to, the term sheets exchanged on August 28, September 6, November 7 and 13, and December 12, 2012, the proposals made by S. Markel in his telephone conversations with defendant Becker on October 24 and December 10, 2012, and the proposal contained in defendant Becker's December 11, 2012 e-mail to S. Markel.

49.      The omission of this information makes the following statements in the Proxy materially misleading:

(a)     In the joint letter to Alterra and Markel shareholders from defendant Becker, President and CEO of Alterra, and Alan I. Kirshner, Chairman of the Board and CEO of Markel, in the introduction to the Proxy, the statement:

> Alterra's board of directors recommends that Alterra shareholders vote "FOR" ... a proposal to approve and adopt the merger agreement and the merger.

(b)     On page vi of the section entitled "Questions and Answers About the Merger and the Special Meetings:

> Alterra's board of directors ... adopted the merger agreement and authorized and approved the merger ... unanimously and determined that the merger consideration constitutes fair value for each Alterra common share ... and deemed it advisable and fair to, and in the best interests of, Alterra to enter into the merger agreement and to consummate the merger and the other transactions contemplated by the merger agreement ... Alterra's board of directors recommends that Alterra shareholders vote "FOR" each matter submitted on the Alterra proxy card.

(c)     On page 40, the statement:

> On August 28, 2012, Mike O'Reilly, Chairman of Alterra's board of directors, and Mr. Becker met with Messrs. Markel, Whitt, Gayner and Kirshner, at Markel's offices in Richmond, Virginia, at which meeting Markel proposed a non-binding draft term sheet, which included among other things, a proposed form of transaction, valuation, form of consideration, tax treatment of the Proposed Merger, board representation, closing conditions and certain provisions intended to address deal certainty.

(d)     On page 40, the statement:

> On September 6, 2012, Alterra, with input from its financial and outside legal advisors, presented proposed changes to Markel's non-binding term sheet, including changes to valuation and board representation.

(e)     On page 41, the statement:

> On October 24, 2012, following further deliberation, Mr. Markel called Mr. Becker to ask to reengage in conversations upon terms closer to Alterra's September 6, 2012 version of the non-binding draft term sheet.

(f)     On page 41, the statement:

> On November 7, 2012, Alterra delivered the revised non-binding term sheet to Markel, which was substantially similar to that provided on September 6, 2012, but

with a simplified valuation section, subject to due diligence and suggested employee provisions. Also delivered were estimated cost savings analyses and other diligence items.

(g)    On page 41, the statement:

On November 13, 2012, Mr. Becker provided Mr. Markel with a further revised non-binding term sheet that reflected the November 12, 2012, discussions and suggested an accelerated timeline should the parties agree to proceed.

(h)    On page 42, the statement:

On December 10, 2012, Mr. Markel and Mr. Becker spoke telephonically during which Mr. Markel proposed modifications to various terms in the November 13th term sheet, including valuation, the methodology for determining exchange ratio, the relative portions of cash and stock consideration and the increase in the size of Markel's board of directors.

(i)    On page 42, the statement:

On December 11, 2012, Mr. Becker provided an email response to Mr. Markel, which identified potential synergies and cost savings and included proposed valuation terms.

(j)    On page 42, the statement:

On December 12, 2012, Mr. Markel telephoned Mr. Becker with further revised valuation terms and a proposed timeline to execute definitive documentation and announce a transaction and a revised non-binding term sheet was circulated.

50.    With respect to potential BAML conflicts of interest, the Proxy is materially deficient because it fails to disclose the specific services the Company's financial advisor, BAML, has provided to Alterra and Markel, or their affiliates, in the last two years and the amount of compensation received, or expected to be received, for any such services rendered.

51.    The omission of this information makes the following statements in the Proxy materially misleading:

(a)    On page 43, the statement:

Also at this meeting, BofA Merrill Lynch reviewed with Alterra's board of directors its financial analysis of the merger consideration and delivered to Alterra's board of directors an oral opinion, which was confirmed by delivery of a written opinion dated

December 18, 2012, to the effect that, as of that date and based on and subject to various assumptions and limitations described in its opinion, the merger consideration to be received by holders of Alterra common shares, was fair, from a financial point of view, to such holders as described in " —*Opinion of Merrill, Lynch, Pierce, Fenner & Smith Incorporated, Financial Advisor to Alterra.*"

(b)    On page 58, the statement:

On December 18, 2012, at a meeting of Alterra's board of directors held to evaluate the merger, BofA Merrill Lynch delivered to Alterra's board of directors an oral opinion, which was confirmed by delivery of a written opinion dated December 18, 2012, to the effect that, as of the date of the opinion and based on and subject to various assumptions and limitations described in its opinion, the merger consideration to be received by holders of Alterra common shares was fair, from a financial point of view, to such holders.

(c)    On pages 64-65, the statement:

BofA Merrill Lynch and its affiliates in the past have provided, currently are providing, and in the future may provide, investment banking, commercial banking, financial advisory and other financial services to Alterra and have received or in the future may receive compensation for the rendering of these services, including (i) having acted as financial advisor to Alterra and certain of its affiliates in connection with certain mergers and acquisitions transactions, (ii) having acted or acting as administrative agent, joint lead arranger and joint book runner for, and a lender under, certain credit facilities of Alterra and certain of its affiliates, (iii) having acted as joint book runner in connection with an affiliate of Alterra's issuance of senior notes and (iv) having provided or providing certain derivative trading services to Alterra.

52.    These statements are rendered misleading by the omissions because they give a materially incomplete and distorted picture of the sales process. Specifically, the above statements create the misleading impression that: (i) the Company carried out full and robust negotiations with Markel and ultimately agreed to the best possible terms in the Proposed Merger; and (ii) there were no actual or potential conflicts of interest between the parties and their respective financial advisers.

**BAML's Financial Analyses**

53.    **BAML's Selected Publicly Traded Companies Analysis for Alterra**. The description of BAML's Selected Publicly Traded Companies Analysis on pages 60-61 is materially deficient because it fails to disclose:

(a)     Whether, and to what extent, BAML conducted benchmarking analysis in selecting the companies used in in the analysis.

(b)     The following valuation multiples for each of the selected companies:

(i)     Price/Calendar year ("CY") 2012 estimated ("E") fully-diluted earnings per share ("EPS");

(ii)    Price/CY2013E fully diluted EPS; and

(iii)   Price/Primary book value per share.

54.     The omission of this information renders the following statements in the Proxy materially misleading:

(a)     On page 58, the statement:

On December 18, 2012, at a meeting of Alterra's board of directors held to evaluate the merger, BofA Merrill Lynch delivered to Alterra's board of directors an oral opinion, which was confirmed by delivery of a written opinion dated December 18, 2012, to the effect that, as of the date of the opinion and based on and subject to various assumptions and limitations described in its opinion, the merger consideration to be received by holders of Alterra common shares was fair, from a financial point of view, to such holders.

(b)     On pages 60-61, the statement describing this analysis:

BofA Merrill Lynch reviewed, among other things, earnings per share multiples, based on closing stock prices on December 14, 2012, of the selected publicly traded companies dividend by calendar year 2012 and calendar year 2013 estimated fully diluted EPS. BofA Merrill Lynch also reviewed primary book value per share multiples, based on closing stock prices on December 14, 2012 divided by December 31, 2012 estimated primary book value per share. BofA Merrill Lynch then applied calendar year 2013 EPS multiples of 9.0x to 11.0x derived from the selected publicly traded companies to Alterra's calendar year 2013 estimated fully diluted EPS based on both Alterra's management estimates and research analyst estimates and applied December 31, 2012 book value multiples of 0.75x to 0.85x derived from the selected publicly traded companies to Alterra's December 31, 2012 estimated primary book value per share. BofA Merrill Lynch also reviewed trading multiples of Alterra common shares, based on the closing stock price of Alterra common shares on December 14, 2012 compared to calendar year 2013 estimated fully diluted EPS based on both Alterra's management estimates and research analyst estimates and compared to December 31, 2012 estimated fully diluted book value per share based on Alterra's management estimates. The indicated trading multiples were 8.5x 2013

estimated fully diluted EPS based on Alterra's management estimates, 10.0x 2013 estimated fully diluted EPS based on research analyst estimates and 0.77x December 31, 2012 estimated fully diluted book value based on Alterra's management estimates. Estimated financial data of the selected publicly traded companies were based on publicly available research analysts' estimates, and estimated financial data of Alterra were based on the Alterra management forecasts and publicly available research analysts' estimates. This analysis indicated the following approximate implied per share equity value reference ranges for Alterra, as compared to the implied merger consideration:

| Implied Per Share Equity Value Reference Ranges for Alterra | | | Implied Merger Consideration |
|---|---|---|---|
| 2013E EPS (Alterra Estimates) | 2013E EPS (Research Analyst Estimates) | 12/31/2012E Book Value (Alterra Estimates) | |
| $23.84 - $29.14 | $20.34 - $24.86 | $22.50 - $25.50 | $30.97 |

55.     **BAML's Selected Precedent Transactions Analysis for Alterra**. The description of BAML's Selected Precedent Transaction Analysis on page 61 is materially deficient because it fails to disclose:

(a)     The criteria used to select the transactions used in the analysis.

(b)     Whether, and to what extent, BAML conducted benchmarking analysis in selecting the transactions used in in the analysis.

(c)     The following valuation multiples for each of the selected transactions:

(i)     Price/One-year forward fully-diluted EPS; and

(ii)     Price/Fully-diluted book value per share.

(d)     The reasons why BAML believed it was appropriate to use the same range of CY2013E EPS multiples (9-11%) for both its Selected Precedent Transactions Analysis and Selected Publicly Traded Companies Analysis given that valuations of change-of-control transactions differ from valuations of standalone companies in that such transactions, like the Proposed Merger, typically include a premium in the purchase price to account for the exchange in value.

56.     The omission of this information renders the following statements in the Proxy materially misleading:

(a)      On page 58, the statement:

On December 18, 2012, at a meeting of Alterra's board of directors held to evaluate the merger, BofA Merrill Lynch delivered to Alterra's board of directors an oral opinion, which was confirmed by delivery of a written opinion dated December 18, 2012, to the effect that, as of the date of the opinion and based on and subject to various assumptions and limitations described in its opinion, the merger consideration to be received by holders of Alterra common shares was fair, from a financial point of view, to such holders.

(b)      On page 61, the statement describing the analysis:

BofA Merrill Lynch reviewed transaction values, calculated as the equity value implied for the target company in the selected transaction, as a multiple of the target company's one-year forward fully diluted EPS and as a multiple of the target company's fully diluted book value for the most recent quarter ending before the date on which the transaction was announced. BofA Merrill Lynch then applied one-year forward EPS multiples of 9.0x to 11.0x derived from the selected transactions to Alterra's calendar year 2013 estimated fully diluted EPS based on both Alterra's management estimates and research analyst estimates and applied book value multiples of 0.80x to 0.95x derived from the selected transactions to Alterra's December 31, 2012 estimated fully diluted book value per share. Estimated financial data of the selected transactions were based on publicly available information at the time of announcement of the relevant transaction. Estimated financial data of Alterra were based on the Alterra management forecasts and publicly available research analysts' estimates. This analysis indicated the following approximate implied per share equity value reference ranges for Alterra, as compared to the implied merger consideration:

| Implied Per Share Equity Value Reference Ranges for Alterra | | | Implied Merger Consideration |
|---|---|---|---|
| 2013E EPS (Alterra Estimates) | 2013E EPS (Research Analyst Estimates) | 12/31/2012E Book Value (Alterra Estimates) | |
| $23.84 - $29.14 | $20.34 - $24.86 | $23.41 - $27.80 | $30.97 |

57.   **BAML's Discounted Cash Flow Analysis for Alterra.** The description of BAML's Discounted Cash Flow Analysis on page 62 is materially deficient because it fails to disclose:

(a)      The definition of levered cash flow, as this term is used in the analysis.

(b)      The inputs and assumptions used to derive the range of discount rates (8-10%) used in the analysis.

(c)      The range of implied perpetuity growth rates used in the analysis.

(d)   How stock-based compensation was treated in the analysis (i.e., as a cash or non-cash expense).

(e)   How, if at all, the value of the Company's Net Operating Losses ("NOLs") were accounted for in the analysis.

58.   The omission of this information renders the following statements in the Proxy materially misleading:

(a)   On page 58, the statement:

On December 18, 2012, at a meeting of Alterra's board of directors held to evaluate the merger, BofA Merrill Lynch delivered to Alterra's board of directors an oral opinion, which was confirmed by delivery of a written opinion dated December 18, 2012, to the effect that, as of the date of the opinion and based on and subject to various assumptions and limitations described in its opinion, the merger consideration to be received by holders of Alterra common shares was fair, from a financial point of view, to such holders.

(b)   On page 62, the statement describing this analysis:

BofA Merrill Lynch performed a discounted cash flow analysis of Alterra to calculate the estimated present value of the standalone levered, after-tax free cash flows that Alterra was forecasted to generate during Alterra's fiscal years 2013 through 2017 based on the Alterra management forecasts. BofA Merrill Lynch calculated terminal values for Alterra by applying terminal multiples of 0.80x to 1.00x to Alterra's December 31, 2017 estimated book value. The cash flows and terminal values were then discounted to present value as of December 31, 2012 using discount rates ranging from 8% to 10%, which were based on an estimate of Alterra's cost of equity. This analysis indicated the following approximate implied per share equity value reference range for Alterra as compared to the implied merger consideration:

| Implied Per Share Equity Value Reference Range for Alterra | Implied Merger Consideration |
|---|---|
| $24.17 - $29.49 | $30.97 |

59.   **BAML's Selected Publicly Traded Companies Analysis for Markel.**  The description of BAML's Selected Publicly Traded Companies Analysis on pages 62-63 is materially deficient because it fails to disclose:

(a)    Whether, and to what extent, BAML conducted benchmarking analysis in selecting comparable companies in the analysis.

(b)    Whether BAML relied upon Markel management's financial forecasts as is or as adjusted by Alterra in conducting its analysis.

(c)    The following multiples for each of the selected companies:

(i)    Price/CY2012E fully-diluted EPS;

(ii)   Price/CY2013E fully-diluted EPS; and

(iii)  Price/Primary book value per share.

60.    The omission of this information renders the following statements in the Proxy materially misleading:

(a)    On page 58, the statement:

On December 18, 2012, at a meeting of Alterra's board of directors held to evaluate the merger, BofA Merrill Lynch delivered to Alterra's board of directors an oral opinion, which was confirmed by delivery of a written opinion dated December 18, 2012, to the effect that, as of the date of the opinion and based on and subject to various assumptions and limitations described in its opinion, the merger consideration to be received by holders of Alterra common shares was fair, from a financial point of view, to such holders.

(b)    On pages 62-63, the statement:

BofA Merrill Lynch reviewed, among other things, earnings per share multiples, based on closing stock prices on December 14, 2012, of the selected publicly traded companies divided by calendar year 2012 and calendar year 2013 estimated fully diluted EPS. BofA Merrill Lynch also reviewed book value per share multiples based on closing stock prices on December 14, 2012 divided by December 31, 2012 estimated primary book value per share. BofA Merrill Lynch then applied calendar year 2013 EPS multiples of 11.0x to 15.0x derived from the selected publicly traded companies to Markel's calendar year 2013 estimated fully diluted EPS based on both Markel's management estimates and research analyst estimates and applied December 31, 2012 book value multiples of 1.10x to 1.40x derived from the selected publicly traded companies to Markel's December 31, 2012 estimated primary book value per share. BofA Merrill Lynch also reviewed trading multiples of Markel common shares, based on the closing stock price of Markel common shares on December 14, 2012 compared to calendar year 2013 estimated fully diluted EPS based on both Markel's management estimates and research analyst estimates and

compared to December 31, 2012 estimated fully diluted book value per share. The indicated trading multiples were 20.0x 2013 estimated fully diluted EPS based on Markel's management estimates, 23.8x 2013 estimated fully diluted EPS based on research analyst estimates and 1.23x December 31, 2012 estimated fully diluted book value based on Markel's management estimates. Estimated financial data of the selected publicly traded companies were based on publicly available research analysts' estimates, and estimated financial data of Markel were based on the Markel management forecasts and publicly available research analysts' estimates. This analysis indicated the following approximate implied per share equity value reference ranges for Markel, as compared to the closing price of Markel common shares on December 14, 2012:

| Implied Per Share Equity Value Reference Ranges for Markel | | | Closing Trading Price of Markel Common Stock on December 14, 2012 |
| 2013E EPS (Markel Estimates) | 2013E EPS (Research Analyst Estimates) | 12/31/2012E Book Value (Markel Estimates) | |
| --- | --- | --- | --- |
| $267.30 - $364.50 | $224.18 - $305.70 | $436.31 - $555.31 | $486.00 |

61.   **BAML's Discounted Cash Flow Analysis for Markel**. The description of BAML's Discounted Cash Flow Analysis on page 63 is materially deficient because it omits:

(a)   The definition of levered cash flow, as used in the analysis.

(b)   The inputs and assumptions used by BAML to derive the range of discount rates (6.5% to 8.5%) used in the analysis.

(c)   How stock-based compensation was treated in the analysis (as a cash or non-cash expense).

(d)   The range of implied perpetuity growth rates derived in the analysis.

(e)   How, if at all, the value of the Company's NOLs were accounted for in the analysis.

62.   The omission of this information renders the following statements in the Proxy materially misleading:

(a)   On page 58, the statement:

On December 18, 2012, at a meeting of Alterra's board of directors held to evaluate the merger, BofA Merrill Lynch delivered to Alterra's board of directors an oral

opinion, which was confirmed by delivery of a written opinion dated December 18, 2012, to the effect that, as of the date of the opinion and based on and subject to various assumptions and limitations described in its opinion, the merger consideration to be received by holders of Alterra common shares was fair, from a financial point of view, to such holders.

      (b)    On page 63, the statement:

BofA Merrill Lynch performed a discounted cash flow analysis of Markel to calculate the estimated present value of the standalone levered, after-tax free cash flows that Markel was forecasted to generate during Markel's fiscal years 2013 through 2017 based on the Markel management forecasts and such forecasts as adjusted for certain changes made by Alterra's management to the assumptions provided by Markel's management. These changes include an increase in the assumed annual appreciation on Markel's equity portfolio. BofA Merrill Lynch calculated terminal values for Markel by applying terminal multiples of 1.10 to 1.30 to Markel's December 31, 2017 estimated book value. The cash flows and terminal values were then discounted to present value as of December 31, 2012 using discount rates ranging from 6.5% to 8.5%, which were based on an estimate of Markel's cost of equity. This analysis indicated the following approximate implied per share equity value reference ranges for Markel as compared to the closing price of Markel common shares on December 14, 2012:

| Implied Per Share Equity Value Reference Range for Markel (Markel Forecasts) | Implied Per Share Equity Value Reference Range for Markel (Adjusted Markel Forecasts) | Closing Trading Price of Markel Common Stock on December 14, 2012 |
|---|---|---|
| $408.71 - $530.06 | $437.66 - $567.61 | $486.00 |

63.    These statements, identified in ¶¶54, 56, 58, 60, and 62 above, are rendered materially misleading by the omissions because they paint a materially incomplete picture of how BAML selected and used the inputs and assumptions in its financial analyses, which, without full disclosure of such information, calls into question BAML's ultimate conclusion that the Proposed Merger is fair, particularly given that $19 million of BAML's $20 million fee is contingent on the Proposed Merger being consummated.

64.    *Alterra's Financial Projections.* According to page 58 of the Proxy, BAML relied upon certain financial forecasts (for fiscal years 2013 through 2017) prepared by Alterra management in performing the above financial analyses. The Proxy, however, does not disclose any

of these financial forecasts, including the following financial data, for fiscal years 2013 through 2017:

    (a)    Total revenue.

    (b)    Income before taxes.

    (c)    Net income.

    (d)    EPS.

    (e)    Fully-diluted EPS.

    (f)    Shares Outstanding.

    (g)    Total Assets.

    (h)    Shareholders' equity.

    (i)    Distributable cash flow.

    (j)    Dividends paid.

65.    The omission of this information renders the following statements in the Proxy materially misleading:

    (a)    On page 58, the statement:

On December 18, 2012, at a meeting of Alterra's board of directors held to evaluate the merger, BofA Merrill Lynch delivered to Alterra's board of directors an oral opinion, which was confirmed by delivery of a written opinion dated December 18, 2012, to the effect that, as of the date of the opinion and based on and subject to various assumptions and limitations described in its opinion, the merger consideration to be received by holders of Alterra common shares was fair, from a financial point of view, to such holders.

    (b)    On pages 60-61, the statement:

BofA Merrill Lynch reviewed, among other things, earnings per share multiples, based on closing stock prices on December 14, 2012, of the selected publicly traded companies dividend by calendar year 2012 and calendar year 2013 estimated fully diluted EPS. BofA Merrill Lynch also reviewed primary book value per share multiples, based on closing stock prices on December 14, 2012 divided by December 31, 2012 estimated primary book value per share. BofA Merrill Lynch then applied calendar year 2013 EPS multiples of 9.0x to 11.0x derived from the selected publicly

traded companies to Alterra's calendar year 2013 estimated fully diluted EPS based on both Alterra's management estimates and research analyst estimates and applied December 31, 2012 book value multiples of 0.75x to 0.85x derived from the selected publicly traded companies to Alterra's December 31, 2012 estimated primary book value per share. BofA Merrill Lynch also reviewed trading multiples of Alterra common shares, based on the closing stock price of Alterra common shares on December 14, 2012 compared to calendar year 2013 estimated fully diluted EPS based on both Alterra's management estimates and research analyst estimates and compared to December 31, 2012 estimated fully diluted book value per share based on Alterra's management estimates. The indicated trading multiples were 8.5x 2013 estimated fully diluted EPS based on Alterra's management estimates, 10.0x 2013 estimated fully diluted EPS based on research analyst estimates and 0.77x December 31, 2012 estimated fully diluted book value based on Alterra's management estimates. Estimated financial data of the selected publicly traded companies were based on publicly available research analysts' estimates, and estimated financial data of Alterra were based on the Alterra management forecasts and publicly available research analysts' estimates. This analysis indicated the following approximate implied per share equity value reference ranges for Alterra, as compared to the implied merger consideration:

| Implied Per Share Equity Value Reference Ranges for Alterra | | | Implied Merger Consideration |
|---|---|---|---|
| 2013E EPS (Alterra Estimates) | 2013E EPS (Research Analyst Estimates) | 12/31/2012E Book Value (Alterra Estimates) | |
| $23.84 - $29.14 | $20.34 - $24.86 | $22.50 - $25.50 | $30.97 |

(c)    On page 61, the statement:

BofA Merrill Lynch reviewed transaction values, calculated as the equity value implied for the target company in the selected transaction, as a multiple of the target company's one-year forward fully diluted EPS and as a multiple of the target company's fully diluted book value for the most recent quarter ending before the date on which the transaction was announced. BofA Merrill Lynch then applied one-year forward EPS multiples of 9.0x to 11.0x derived from the selected transactions to Alterra's calendar year 2013 estimated fully diluted EPS based on both Alterra's management estimates and research analyst estimates and applied book value multiples of 0.80x to 0.95x derived from the selected transactions to Alterra's December 31, 2012 estimated fully diluted book value per share. Estimated financial data of the selected transactions were based on publicly available information at the time of announcement of the relevant transaction. Estimated financial data of Alterra were based on the Alterra management forecasts and publicly available research analysts' estimates. This analysis indicated the following approximate implied per share equity value reference ranges for Alterra, as compared to the implied merger consideration:

| Implied Per Share Equity Value Reference Ranges for Alterra | | | Implied Merger Consideration |
|---|---|---|---|
| 2013E EPS (Alterra Estimates) | 2013E EPS (Research Analyst Estimates) | 12/31/2012E Book Value (Alterra Estimates) | |
| $23.84 - $29.14 | $20.34 - $24.86 | $23.41 - $27.80 | $30.97 |

    (d)    On page 62, the statement:

BofA Merrill Lynch performed a discounted cash flow analysis of Alterra to calculate the estimated present value of the standalone levered, after-tax free cash flows that Alterra was forecasted to generate during Alterra's fiscal years 2013 through 2017 based on the Alterra management forecasts. BofA Merrill Lynch calculated terminal values for Alterra by applying terminal multiples of 0.80x to 1.00x to Alterra's December 31, 2017 estimated book value. The cash flows and terminal values were then discounted to present value as of December 31, 2012 using discount rates ranging from 8% to 10%, which were based on an estimate of Alterra's cost of equity. This analysis indicated the following approximate implied per share equity value reference range for Alterra as compared to the implied merger consideration:

| Implied Per Share Equity Value Reference Range for Alterra | Implied Merger Consideration |
|---|---|
| $24.17 - $29.49 | $30.97 |

66.    *Markel's Financial Projections.*  According to page 58 of the Proxy, BAML relied upon certain financial forecasts (for fiscal years 2013 through 2017) prepared by Markel's management in performing the above financial analyses. The Proxy, however, does not disclose any of these financial forecasts, including the following financial data, for fiscal years 2013 through 2017:

    (a)    Total revenue.

    (b)    Income before taxes.

    (c)    Net income.

    (d)    EPS.

    (e)    Fully-diluted EPS.

    (f)    Shares Outstanding.

    (g)    Total Assets.

    (h)    Shareholders' equity.

      (i)      Distributable cash flow.

      (j)      Dividends paid.

67.    The omission of this information renders the following statements in the Proxy materially misleading:

      (a)     On page 58, the statement:

On December 18, 2012, at a meeting of Alterra's board of directors held to evaluate the merger, BofA Merrill Lynch delivered to Alterra's board of directors an oral opinion, which was confirmed by delivery of a written opinion dated December 18, 2012, to the effect that, as of the date of the opinion and based on and subject to various assumptions and limitations described in its opinion, the merger consideration to be received by holders of Alterra common shares was fair, from a financial point of view, to such holders.

      (b)     On pages 62-63, the statement:

BofA Merrill Lynch reviewed, among other things, earnings per share multiples, based on closing stock prices on December 14, 2012, of the selected publicly traded companies dividend by calendar year 2012 and calendar year 2013 estimated fully diluted EPS. BofA Merrill Lynch also reviewed book value per share multiples based on closing stock prices on December 14, 2012 divided by December 31, 2012 estimated primary book value per share. BofA Merrill Lynch then applied calendar year 2013 EPS multiples of 11.0x to 15.0x derived from the selected publicly traded companies to Markel's calendar year 2013 estimated fully diluted EPS based on both Markel's management estimates and research analyst estimates and applied December 31, 2012 book value multiples of 1.10x to 1.40x derived from the selected publicly traded companies to Markel's December 31, 2012 estimated primary book value per share. BofA Merrill Lynch also reviewed trading multiples of Markel common shares, based on the closing stock price of Markel common shares on December 14, 2012 compared to calendar year 2013 estimated fully diluted EPS based on both Markel's management estimates and research analyst estimates and compared to December 31, 2012 estimated fully diluted book value per share. The indicated trading multiples were 20.0x 2013 estimated fully diluted EPS based on Markel's management estimates, 23.8x 2013 estimated fully diluted EPS based on research analyst estimates and 1.23x December 31, 2012 estimated fully diluted book value based on Markel's management estimates. Estimated financial data of the selected publicly traded companies were based on publicly available research analysts' estimates, and estimated financial data of Markel were based on the Markel management forecasts and publicly available research analysts' estimates. This analysis indicated the following approximate implied per share equity value reference ranges for Markel, as compared to the closing price of Markel common shares on December 14, 2012:

| 2013E EPS (Markel Estimates) | 2013E EPS (Research Analyst Estimates) | 12/31/2012E Book Value (Markel Estimates) | Closing Trading Price of Markel Common Stock on December 14, 2012 |
|---|---|---|---|
| $267.30 - $364.50 | $224.18 - $305.70 | $436.31 - $555.31 | $486.00 |

    (c)      On page 63, the statement:

BofA Merrill Lynch performed a discounted cash flow analysis of Markel to calculate the estimated present value of the standalone levered, after-tax free cash flows that Markel was forecasted to generate during Markel's fiscal years 2013 through 2017 based on the Markel management forecasts and such forecasts as adjusted for certain changes made by Alterra's management to the assumptions provided by Markel's management. These changes include an increase in the assumed annual appreciation on Markel's equity portfolio. BofA Merrill Lynch calculated terminal values for Markel by applying terminal multiples of 1.10 to 1.30 to Markel's December 31, 2017 estimated book value. The cash flows and terminal values were then discounted to present value as of December 31, 2012 using discount rates ranging from 6.5% to 8.5%, which were based on an estimate of Markel's cost of equity. This analysis indicated the following approximate implied per share equity value reference ranges for Markel as compared to the closing price of Markel common shares on December 14, 2012:

| Implied Per Share Equity Value Reference Range for Markel (Markel Forecasts) | Implied Per Share Equity Value Reference Range for Markel (Adjusted Markel Forecasts) | Closing Trading Price of Markel Common Stock on December 14, 2012 |
|---|---|---|
| $408.71 - $530.06 | $437.66 - $567.61 | $486.00 |

68.     The omission of Markel's projections renders these statements materially misleading because without access to Markel management's estimates of its future cash flows, Alterra shareholders cannot reliably compare the intrinsic value of the Company to the stock component of the consideration offered by the Proposed Merger, and thus cannot determine whether the Proposed Merger is indeed fair, as defendants and BAML claim.

## CLASS ACTION ALLEGATIONS

69.     Plaintiff brings this action for itself and on behalf of all holders of Alterra common stock which have been or will be harmed by the conduct described herein (the "Class"). Excluded from the Class are the defendants and any individual or entity affiliated with any defendant.

70.     This action is properly maintainable as a class action.

- 30 -

71.     The Class is so numerous that joinder of all members is impracticable.  According to Alterra's SEC filings, there were approximately 95.9 million shares of Alterra common stock outstanding as of November 6, 2012.

72.     There are questions of law and fact which are common to the Class and which predominate over questions affecting any individual Class member.  The common questions include, inter alia, the following:

(a)     Whether the Proxy contains material misstatements or omissions in violation of sections 14(a) and 20(a) of the Exchange Act.

(b)     Whether the Individual Defendants have oppressed Alterra shareholders in connection with the Proposed Merger by: (i) failing to take steps to maximize the value of Alterra to its public shareholders; (ii) failing to properly value Alterra and its various assets and operations; and (iii) ignoring and not protecting Alterra shareholders against the numerous conflicts of interest.

(c)     Whether plaintiff and the other members of the Class would suffer irreparable injury were the transactions complained of herein consummated.

73.     Plaintiff's claims are typical of the claims of the other members of the Class and Plaintiff does not have any interests adverse to the Class.

74.     Plaintiff has retained competent counsel experienced in litigation of this nature and will fairly and adequately represent and protect the interests of the Class.

75.     The prosecution of separate actions by individual members of the Class would create a risk of inconsistent or varying adjudications with respect to individual members of the Class which would establish incompatible standards of conduct for the party opposing the Class.

76.     Plaintiff anticipates that there will be no difficulty in the management of this litigation. A class action is superior to other available methods for the fair and efficient adjudication of this controversy.

77.     Defendants have acted on grounds generally applicable to the Class with respect to the matters complained of herein, thereby making appropriate the relief sought herein with respect to the Class as a whole.

## COUNT I

### Against the Individual Defendants, Alterra, and Markel for Violations of Section 14(a) of the Exchange Act and SEC Rule 14a-9 Promulgated Thereunder

78.     Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

79.     The Individual Defendants, Alterra, and Markel disseminated the false and misleading Proxy specified above, which failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

80.     The Proxy was prepared, reviewed, and/or disseminated by the Individual Defendants, Alterra, and Markel. It misrepresented and/or omitted material facts, including material information about the actual intrinsic value of the Company.

81.     In so doing, the Individual Defendants, Alterra, and Markel made untrue statements of material facts and omitted to state material facts necessary to make the statements that were made not misleading in violation of Section 14(a) of the Exchange Act and SEC Rule 14a-9 promulgated thereunder.

82.     The Individual Defendants, Alterra, and Markel were at least negligent in filing the Proxy with these materially false and misleading statements.

83.    The omissions and false and misleading statements in the Proxy are material in that a reasonable shareholder would consider them important in deciding how to vote on the Proposed Merger. In addition, a reasonable investor would view a full and accurate disclosure as significantly altering the "total mix" of information made available in the Proxy and in other information reasonably available to shareholders.

84.    By reason of the foregoing, the Individual Defendants, Alterra, and Markel have violated Section 14(a) of the Exchange Act and SEC Rule 14a-9(a) promulgated thereunder.

85.    Because of the false and misleading statements in the Proxy, plaintiff is threatened with irreparable harm, rendering money damages inadequate. Therefore, injunctive relief is appropriate to ensure defendants' misconduct is corrected.

## COUNT II

### Against the Individual Defendants for Violation of Section 20(a) of the Exchange Act

86.    Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

87.    The Individual Defendants acted as controlling persons of Alterra within the meaning of Section 20(a) of the Exchange Act as alleged herein. By virtue of their positions as officers and/or directors of Alterra, and participation in and/or awareness of the Company's operations and/or intimate knowledge of the false statements contained in the Proxy filed with the SEC, they had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements which plaintiff contends are false and misleading.

88.    Each of the Individual Defendants was provided with or had unlimited access to copies of the Proxy and other statements alleged by plaintiff to be misleading prior to and/or shortly

after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

89.     In particular, each of the Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company, and, therefore, each is presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same. The Proxy at issue contains the unanimous recommendation of each of the Individual Defendants to approve the Proposed Merger. They were, thus, directly involved in the making of the Proxy.

90.     In addition, as the Proxy sets forth at length, and as described herein, the Individual Defendants were each involved in negotiating, reviewing, and approving the Proposed Merger. The Proxy purports to describe the various issues and information that they reviewed and considered, descriptions of which had input from the directors. By virtue of the foregoing, the Individual Defendants have violated Section 20(a) of the Exchange Act.

91.     As set forth above, the Individual Defendants had the ability to exercise control over and did control a person or persons who have each violated Section 14(a) and SEC Rule 14a-9, by their acts and omissions as alleged herein. By virtue of their positions as controlling persons, these defendants are liable pursuant to Section 20(a) of the Exchange Act.

## COUNT III

### Claim for Oppression Under Bermuda Companies Act of 1981
### Against the Individual Defendants

92.     Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

93.     In accordance with section 111 of the Bermuda Companies Act of 1981, any shareholder who complains that the affairs of a company are being conducted or that the powers of

the directors of a company are being exercised in a manner oppressive to him or any of the members (including himself), or in disregard of his or their interests as members, may apply to the court for an order under this section.

94.     If, on such application, the court is of opinion that the company's affairs are being conducted or the directors' powers are being exercised as aforesaid, the court "may, with a view to bringing to an end the matters complained of, make such order as it thinks fit," including enjoining or rescinding the oppressive transaction.

95.     It is unlawful under Bermuda law for the directors to disregard the interests of a minority of the member's interests (as members), even where the Proposed Merger put forward is put forward in good faith, and such disregard will amount to oppression under Bermuda law, and to a remedy against the Board of Alterra under Bermuda corporate law for the oppressive actions of the Board.

96.     Under Bermuda law, courts are provided with the authority to enjoin the sale of a company as oppressive to shareholders where, as here, the Board is attempting to sell the Company at less than fair value, is acting in breach of its duties, and is conflicted in its interests.

97.     As demonstrated by the allegations above, the Individual Defendants have acted in an oppressive manner to the shareholders of Alterra because, among other reasons:

(a)     they failed to take steps to maximize the value of Alterra to its public shareholders;

(b)     they failed to properly value Alterra and its various assets and operations; and

(c)     they ignored or did not protect against the conflicts of interest resulting from the directors' personal interests in the Proposed Merger.

98.     Because the Individual Defendants dominate and control the business and corporate affairs of Alterra, and are in possession of or have access to private corporate information concerning Alterra's assets, business, and future prospects, there exists an imbalance and disparity of knowledge and economic power between them and the public shareholders of Alterra which makes it inherently unfair and oppressive for them to pursue and recommend any proposed transaction wherein they will reap disproportionate benefits to the exclusion of maximizing shareholder value.

99.     As a result of the Individual Defendants' oppressive and unlawful actions, plaintiff and the other members of the Class will be irreparably harmed in that they will not receive their fair portion of the value of Alterra's assets and operations.  Unless the Proposed Merger is enjoined by the Court, the Individual Defendants will continue to act in an oppressive manner to plaintiff and the members of the Class, will not engage in arm's-length negotiations on the Proposed Merger terms, and may consummate the Proposed Merger, all to the irreparable harm of the members of the Class.

## PRAYER FOR RELIEF

WHEREFORE, plaintiff demands injunctive relief, in its favor and in favor of the Class and against defendants as follows:

A.     Declaring that this action is properly maintainable as a class action;

B.     Declaring and decreeing that the Merger Agreement is unlawful and unenforceable;

C.     Declaring and decreeing that defendants have acted and are acting in an oppressive manner to the Company's shareholders;

D.     Rescinding, to the extent already implemented, the Merger Agreement;

E.     Enjoining defendants, their agents, counsel, employees, and all persons acting in concert with them from consummating the Proposed Merger, unless and until the Company: (i) adopts and implements a procedure or process reasonably designed to provide the best possible value

for shareholders; and (ii) amends the Proxy so as to provide Alterra shareholders with all material information concerning the Proposed Merger as required by the Exchange Act;

F.       Directing the Individual Defendants to commence a sale process that is reasonably designed to obtain a transaction which is in the best interests of Alterra shareholders;

G.       Imposition of a constructive trust, in favor of plaintiff and members of the Class, upon any benefits improperly received by defendants as a result of their wrongful conduct;

H.       Awarding plaintiff the costs and disbursements of this action, including reasonable attorneys' and experts' fees; and

I.       Granting such other and further equitable relief as this Court may deem just and proper.

## JURY DEMAND

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiff hereby demands a trial by jury on all issues so triable.

Dated: February 8, 2013

GLANCY BINKOW & GOLDBERG LLP

BRIAN P. MURRAY (BM 9954)
bmurray@glancylaw.com
GREGORY B. LINKH (GL 0477)
glinkh@murrayfrank.com
77 Water Street, Suite 721
New York, NY 10005
Telephone:  (646) 722-4180
Facsimile: (310) 201-9160

ROBBINS ARROYO LLP
BRIAN J. ROBBINS
STEPHEN J. ODDO
ARSHAN AMIRI
EDWARD B. GERARD
JUSTIN D. RIEGER
600 B Street, Suite 1900
San Diego, CA 92101
Telephone:  (619) 525-3990
Facsimile:  (619) 525-3991
Email: brobbins@robbinsarroyo.com

soddo@robbinsarroyo.com
aamiri@robbinsarroyo.com
egerard@robbinsarroyo.com
jrieger@robbinsarroyo.com

BRANNON LAW FIRM, LLC
PAUL M. BRANNON
3500 North Hullen Street
Metairie, LA 70002
Telephone: (504) 456-8600
Facsimile: (504) 456-8697
Email: pmb@brannonlawfirm.com

O'BELL, L.L.C.
ERIC J. O'BELL
3500 North Hullen Street
Metairie, LA 70002
Telephone: (504) 456-8600
Facsimile: (504) 456-8653
Email: eric@ghwlegal.com

Attorneys for Plaintiff

## CERTIFICATION OF PLAINTIFF
## PURSUANT TO FEDERAL SECURITIES LAW

Louisiana Municipal Police Employees Retirement System ("Plaintiff") declares as to the claims asserted, or to be asserted, under the federal securities laws, that:

1.      Plaintiff has reviewed the Class Action Complaint, has authorized its filing, and has retained Brannon Law Firm, L.L.C., O'Bell, LLC and Robbins Arroyo LLP as counsel in this action for all purposes.

2.      Plaintiff did not acquire the security that is the subject of this action at the direction of Brannon Law Firm, L.L.C., O'Bell, LLC or Robbins Arroyo LLP or in order to participate in any private action or any other litigation under the federal securities laws.

3.      Plaintiff is willing to serve as a representative party on behalf of a class, including providing testimony at deposition and trial, if necessary, and Plaintiff is willing to serve as a lead plaintiff, a lead plaintiff being a representative party who acts on behalf of other class members in directing the action.

4.      Plaintiff has sought to serve or served as a representative party for a class in numerous actions filed under the federal securities laws within the past three years pursuant to its fiduciary duty to its pension fund contributors.  Plaintiff is a sophisticated investor with experience in bringing this sort of action.

5.      Plaintiff will not accept any payment for serving as a representative party on behalf of the class beyond the Plaintiff's pro rata share of any recovery, except such reasonable costs and expenses (including lost wages) directly relating to the representation of the class as ordered or approved by the Court.

6.      The undersigned represents and warrants that at all times relevant, she was and is currently the Director of the Louisiana Municipal Police Employees Retirement System ("MPERS") and that she is fully authorized to enter into and execute this certification on behalf of Plaintiff.

7.      I declare under penalty of perjury that the foregoing is true and correct.  Executed this 7th day of _Feburary_, 2013.

Kathy Bourque, Director
Louisiana Municipal Police Employees
Retirement System